**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>[1] JOSE ALEXIS ACOSTA,<br><br>Defendant. | **CRIMINAL NO. 22-380 (RAM)** |

**AMENDED OPINION AND ORDER NUNC PRO TUNC[1]**

RAUL ARIAS MARXUACH, United States District Judge.

Pending before the Court are (1) the Government's *Sentencing Memorandum* (Docket No. 157) which objects to the Amended Presentence Report (Docket No. 138) awarding Defendant Jose Alexis Acosta ("Acosta" or "Defendant") a mitigating role adjustment under USSG 3B1.2(b) and the concomitant additional reductions in the offense level under USSG 2D1.1(a)(5); and (2) Defendant Acosta's *Response in Opposition to Government's Sentencing Memorandum* (Docket No. 161). Having considered the parties' written submissions, oral arguments, and proffers, the Court **GRANTS** the Government's objections.

**I.    Factual and Procedural Background**

This case arises from the arrest of Acosta and his co-Defendant Luis Alfredo Jimenez-Diaz ("Jimenez"), who were part of

---

[1] The Opinion and Order is hereby amended to correct scrivener's errors.

Criminal No. 22-380-1 (RAM)                                              2

a pickup crew that retrieved approximately 665.8 kilograms of cocaine from a yola-type vessel at a beach in Luquillo, Puerto Rico, and transported that illegal payload by land.

According to the parties' stipulation of facts, and the Amended PSR's unobjected description of the offense conduct, on or about Thursday, August 18, 2022, at approximately 11:18 p.m., law enforcement observed a suspicious vehicle leaving the area of Playa La Selva, a known smuggling area at a beach located in Luquillo, Puerto Rico. (Docket No. 148 ¶ 14).

Law enforcement observed a white Chevrolet Silverado pick-up truck, bearing three individuals, traveling away from Playa La Selva. Law enforcement observed that the rear of the Silverado had what appeared to be bales, consistent with the shape and size of those typically used to transport illicit drugs, under a dark-colored tarp. Law enforcement observed the shape of the corners of large bales, not neatly stacked, pushing through the tarp. Further, law enforcement observed the Silverado drive through a red traffic light at which other cars were already stopped and waiting for the light to change. Id. ¶ 15. The bales observed by law enforcement are commonly used by drug traffickers to pack and transport bulk quantities of illicit controlled substances, such as cocaine. Id. ¶ 16.

When law enforcement activated lights and sirens to attempt to conduct a stop of the Silverado in Carolina, Puerto Rico, the

Criminal No. 22-380-1 (RAM)                                              3

Silverado fled. A few minutes later, the Silverado crashed into a grassy area in Carolina. Law enforcement observed that three individuals exited the Silverado and ran. Id. ¶ 17.

Shortly after, law enforcement was notified that there were three individuals hiding on the back patio of a house close to where the Silverado had crashed. Immediately thereafter, law enforcement responded and discovered two individuals hiding behind the house less than one mile from the crash location. At this time, at approximately 1:15 a.m., on August 19, 2022, law enforcement arrested Acosta and Jimenez. Law enforcement observed that Acosta and Jimenez were wearing dark-colored clothing, that was wet and covered with sand. Id. ¶ 18.

Law enforcement recovered approximately 13 bales containing brick-shaped packages, weighing approximately 665.8 kilograms, from the Chevrolet Silverado. Two field tests of the substance in the brick-shaped packages tested positive for cocaine. Law enforcement also recovered approximately two cellular phones, one global positioning system (GPS) device, and one Glock Gen 5 Model 26 handgun bearing serial number AFCL27O, loaded with a bullet in the chamber and a magazine with nine bullets. Id. ¶ 19.

One cellular phone was in Acosta's hand when he was arrested, and the other cellular phone was discovered in a waist pack found on Jimenez. Id. ¶ 20. The GPS device was found in the glove

Criminal No. 22-380-1 (RAM)                                          4

compartment of the Silverado. Id. The handgun was discovered on the floor of the driver's side of the Silverado. Id.

On September 23, 2025, Acosta entered into a Plea Agreement where he stipulated to the above facts and admitted to knowingly having: (a) assisted with the coordinates to ensure the yola arrived at the beach; (b) carried the bales of cocaine from the yola; and (c) carried bales of cocaine onto the Silverado; (d) actually or constructively possessed Glock firearm located in the Silverado; and (e) would receive compensation for his participation in the offense. (Docket No. 138).

The Plea Agreement's recommended guideline calculation yielded a total adjusted offense level of 35. Id. at 4. The calculations began with a total offense level of 38 under USSG § 2D1.1(c) for possession of more than 450kg of cocaine which is the maximum amount factored in the guidelines. Id. The parties added two levels for possession of a firearm under USSG § 2D1.1(b)(1), deducted 2 points for early acceptance of responsibility pursuant to USAO-PR policy, and deducted 3 points for acceptance of responsibly under USSG § 3E1.1. Id. At the total adjusted offense level of **35,** the guideline sentencing range started at **168 to 210** months of imprisonment for criminal history category I. Id. The United States and Acosta stipulated that no further adjustments or departures and variant sentence would be requested under 18 U.S.C. § 3553-other than any explicitly provided in the plea agreement.

Id. at 5. Also in the Plea Agreement, Acosta acknowledged that the offense carries a mandatory minimum term of imprisonment of 120 months. Id. at 4. Lastly, the parties further agreed to recommend a sentence of **168** months of imprisonment. Id.

On December 2, 2025, the Probation Officer issued the original Presentence Investigation Report. (Docket No. 144). The offense level computation started with a base offense level of 38 because the offense involved 450kg or more of cocaine pursuant to U.S.S.G. § 2D1.1(b)(1). Id. at 7. After the 2-point firearms enhancement in U.S.S.G. 2D1.1(b)(1), and the 3-point acceptance of responsibility deduction in U.S.S.G. § 3E.1.(a) & (b), the resulting total adjusted offense level was **37**. Id. at 7-8. Coupled with Acosta's criminal history category of I, the resulting guideline sentencing range was from **210 to 262** months. Id. at 12.

On December 29, 2025, the probation officer issued an Amended PSR which started with the same base offense level of 38. (Docket No. 148 at 7). However, the Amended PSR awarded Acosta a 4-level minimal participant mitigating role downward adjustment under U.S.S.G § 3B1.2 because the Probation Officer concluded that Acosta's primary function in the offense was "plainly among the lowest level of drug trafficking functions such as service as a courier, running errands, sending or receiving phone calls or messages, or acting as lookout." Id. at 7-8, fn. 3.

The Amended PSR did not perform the U.S.S.G. § 3B1.2 mitigating role analysis required by the First Circuit's opinion in U.S. v. Guía-Sendeme, 134 F.4th 611 (1st Cir. 2025). Instead, the Amended PSR relied on the special instruction on the application of U.S.S.G. § 3B1.2 to U.S.S.G. § 2D1.1 cases that is part of the November 1, 2025 amendments to the Sentencing Guidelines.  Id. at 7-8, fn. 3; USSG § 2D1.1 (e)(2) (Application of 3B1.2 (Mitigating Role) to § 2D.1.1. Cases). The Probation Officer posited that while the Sentencing Guidelines do not define the term "courier", "a review of the Black's Law Dictionary (12th ed. 2024) defines the term as "[s]omebody who has been employed to transport illegal drugs." Id. at 8, fn. 3.  The Probation Officer also noted that she did not receive any information or credible evidence regarding the five, non-exhaustive factors prescribed in the commentary to U.S.S.G. § 3B1.2 that are used to compare a defendant's culpability to that of the average participant.  Id.

The Amended PSR's 4-point minimal participant deduction unlocked a reduction of the offense level from 38 to 30 pursuant to the November 1, 2025, amendments to the Sentencing Guidelines. See USSG § 2D1.1(a)(5). After the 2-point firearms enhancement in U.S.S.G. 2D1.1(b)(1), the 4-point minimal participant deduction in U.S.S.G. § 3B1.2(a), and the 3-point acceptance of responsibility deduction U.S.S.G. § 3E.1.(a) & (b), the resulting total adjusted offense level was **25.** Id. at 8. Coupled with Acosta's criminal

Criminal No. 22-380-1 (RAM)                                              7

history category of I, the Amended PSR provides that Acosta's guideline sentencing range is from **57 to 71** months of imprisonment. Id. at 13.

On January 1, 2026, the Government filed its Sentencing Memorandum in which it objected to the Amended PSR's offense level computations. (Docket 157). The Government also did not conduct the analysis mandated by Guia-Sendeme. Instead, it argued that the Amended PSR's conclusion that Acosta performed among the "lowest level drug-trafficking functions" is devoid of any factual support or analysis. (Docket No. 157 at 6). Based on the five, non-exhaustive factors in U.S.S.G. § 3B1.2, the Government argued that Acosta did not qualify for a mitigating role. Id. at 9-15. According to the Government: (1) Acosta' actions show he understood the scope and structure of the criminal activity; (2) his active participation at the beach and communication with co-conspirators regarding the GPS coordinates show participation in planning or organizing the criminal activity; (3) Acosta's exercise of, or influence over, decision making activity is inferred from his coordination of the entry point of the drug-laden yola and the subsequent steps to offload the cocaine and flee the area; (4) the nature and extent of Acosta's participation in the criminal activity and the discretion he exercised is shown by his responsibility for the coordinates, offloading and transporting the cocaine among other actions; and (5) Acosta stood to receive

$10,000 from the criminal activity. Id.  The Government pointed to the estimated $5 million value of the cocaine as evidence that Defendant was a trusted member of the drug trafficking organization. Id. at 12 The Government also argued that transporting 558 kilograms of cocaine is not a low-level trafficking function or acting as a mere "courier". Id. at 14-15.[2]

Acosta filed a response to the Government's Sentencing Memorandum on January 12, 2026. (Docket No. 161). Acosta retorted that none of the actions highlighted by the Government justify denying Acosta a minimal role adjustment under the special instructions in the November 1, 2025, amendments. (Id. at 2).  The crux of Acosta's argument was that his primary function in the offense was that of a courier: transporting drugs from point A (Luquillo) to point B (Carolina) and  it falls squarely within the definition of "courier" that the Sentencing Commission has given in reports to congress:  "a person who transports or carries drugs with the assistance of vehicle." (Id. at 3-4).

The case was called for sentencing on January 13, 2026. (Docket No. 166). The Court heard Acosta's allocution and the parties' arguments on the mitigating role question which mirrored

---

[2] Given Acosta's possession of a firearm, the Government's Sentencing Memorandum noted that Acosta did not qualify for the safety valve, 18 U.S.C. § 3553 (f)(1)-(5). (Docket No. 157 at 6, fn. 4) That assertion is, of course, undisputed.

their written submissions. The Court took the matter under advisement. Id.

After a series of continuances, the Court issued an order scheduling a further hearing for April 29, 2026. (Docket No. 184). The parties were given advance notice that they should come prepared to "present arguments and evidence on why they qualify for an adjustment under U.S.S.G. § 3B1.2 for being substantially less culpable than the average participant in the criminal activity or under U.S.S.G. § 2D1.1(e)(2)(B)." Id.

The further hearing was held on June 23, 2026. (Docket No. 193). The parties only presented arguments. Id. The Court requested and received the Reports of Investigation ("ROIs"). (Docket No. 196).

## II. APPLICABLE LAW

### A. Mitigating Role Adjustment under U.S.S.G. 3B1.2

Under the Sentencing Guidelines, downward adjustments are available for defendants who played a mitigating role in the relevant criminal activity. U.S.S.G. 3B1.2 of the Guidelines allows a sentencing court to decrease a defendant's offense level by four if he is deemed a minimal participant, two levels if he is deemed a minor participant, and three levels if his role in the offense falls somewhere in between. *See* U.S.S.G. § 3B1.2; *see also* United States v. Andino-Rodríguez, 79 F.4th 7, 31 (1st Cir. 2023); United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 225 (1st Cir.

Criminal No. 22-380-1 (RAM)                                      10

2018). These adjustments apply to "defendants whose role in the offense make them 'substantially less culpable than the average participant in the criminal activity.'" United States v. Mendoza-Maisonet, 962 F.3d 1, 23 (1st Cir. 2020) (quoting U.S.S.G. § 3B1.2 cmt. n.3(A)).

The designation of "minimal" participant is "intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4. A "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." Id. Alternatively, a "minor" participant is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." Id. cmt. n.5.

The Commentary notes that a "defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." Id. cmt. n.3. Furthermore, the "**fact that a defendant performs an essential or indispensable role in criminal activity is not determinative**." Id. While a defendant may receive an adjustment if he or she is "substantially less culpable than the average participant in the criminal activity," this does not mean that "every such offender is entitled to a mitigating role adjustment; it merely instructs that every such

Criminal No. 22-380-1 (RAM)                                          11

offender 'should be considered for a mitigating role adjustment.'"
United States v. Arias-Mercedes, 901 F.3d 1, 9 (1st Cir. 2018)
(quoting U.S.S.G. App. C, Amend. 794).

The determination of whether to apply an adjustment, and the
level of which, is "based on the totality of the circumstances and
involves a determination that is heavily dependent upon the facts
of the particular case." U.S.S.G. § 3B1.2 cmt. n.3(C); *see* United
States v. Pérez, 819 F.3d 541, 545 (1st Cir. 2016) ("Role-in-the-
offense determinations are notoriously fact specific."). A
"defendant seeking the mitigating role adjustment 'bears the
burden of proving, by a preponderance of the evidence, that he is
entitled to the downward adjustment.'" Mendoza-Maisonet, 962 F.3d
at 23 (quoting Arias-Mercedes, 901 F.3d at 5).

In assessing whether a defendant has met this burden, the
Court should engage in a four-part analysis: (1) identifying the
universe of participants involved in the relevant criminal
activity; (2) ordering each participant along a continuum of
culpability; (3) identifying the average participant across all
likely participants; and (4) comparing the defendant's role in the
criminal activity to the average participant's role. *See* Guía-
Sendeme, 134 F.4th at 617.

At step one, the court "must identify the 'relevant conduct
as a whole' . . . a legal determination requiring a court to
identify the 'scope of the conduct for which the defendant is being

held accountable.'" Id. at 622 (quoting Arias-Mercedes, 901 F.3d at 6-7. "Any determination as to a 'defendant's role in the offense is to be made on the basis of all conduct within the scope of [U.S.S.G.] § 1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction.'" Id. at 619 (quoting U.S.S.G. ch.3, pt. B, introductory cmt.). The scope of relevant conduct defined by U.S.S.G. § 1B1.3 for a "jointly undertaken criminal activity" is "all acts and omissions of others that were – (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). This includes not only the activities "'that occurred during the commission of the offense of conviction,' but also all those undertaken 'in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.'" Guía-Sendeme, 134 F.4th at 619 (quoting U.S.S.G. § 1B1.3(a)(1)(B)). Importantly, "the scope of the 'jointly undertaken criminal enterprise' is not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3, cmt. n.3(B). For example, as applied to a drug distribution conspiracy case, "relevant conduct constitutes only those drug shipments with which the defendant is personally aware, not other shipments facilitated by the broader conspiracy for which the defendant is unaware." Guía-Sendeme, 134 F.4th at 619. Therefore,

Criminal No. 22-380-1 (RAM)                                                13

when performing a mitigating role assessment, the Guidelines require the sentencing court "to limit the scope of the inquiry to the drug shipments for which the defendant is accountable." Id. at 620 (citing U.S.S.G. § 1B1.3, cmt. n.3(b), n.4(A)(i)). Within that relevant conduct, a court "must compare the defendant against all likely participants involved with the shipment, including those involved with the shipment's preparation and efforts to avoid detection." Id. at 620 (citing U.S.S.G. § 3B1.3(a)(1)(B)).

Next, the court conducts a fact-specific inquiry "to identify the universe of participants involved in the particular conduct." Guía-Sendeme, 134 F.4th at 622. A "participant" is someone "who is criminally responsible for the commission of the offense, but need not have been convicted." Arias-Mercedes, 901 F.3d at 6 (quoting U.S.S.G. § 3B1.1 cmt. n.1). "To be considered a participant, there must be sufficient evidence of the person's existence and involvement in the crime." Guía-Sendeme, 134 F.4th at 617; see also United States v. Flores-Álvarez, No. 23-1163, 2025 WL 1369300, *2 (1st Cir. May 12, 2025) (stating a participant's "involvement in the crime must be identifiable or discernable from the record"). A sentencing court cannot assess a mitigating role adjustment "based on suppositions woven entirely out of gossamer strands of speculation and surmise." Arias-Mercedes, 901 F.3d at 7 (citations omitted). But it should consider the broader universe of reasonably discernible participants. See Guía-Sendeme, 134 F.4th at 619

Criminal No. 22-380-1 (RAM)                                    14

("Courts must consider a universe composed of those involved in the defendant's relevant conduct as a whole.") (cleaned up).

At step two, the court must order each participant along a continuum based on their degree of culpability in the criminal activity. Id. at 617; see Andino-Rodríguez, 79 F.4th at 34 (finding First Circuit "case law is clear that all parties engaged in a criminal enterprise can be located on a continuum."). "Those who are primarily responsible stand on one end, while the least culpable participants . . . stand at the opposite end." United States v. Walker, 89 F.4th 173, 185 (1st Cir. 2023) (internal quotation marks omitted). "When a defendant stands somewhere in the middle [of the continuum] . . . a district court may reasonably infer the defendant is not substantially less culpable than the average participant." Andino-Rodríguez, 79 F.4th at 34 (internal quotations omitted).

At step three, from that continuum, courts must "identify the average participant across all likely participants in the criminal scheme." Guía-Sendeme, 134 F.4th at 617. In determining this average, "the court need not identify a single average participant among the universe of discernable participants involved in the relevant conduct" nor "engage in a precise, numerical calculation." Id. (internal quotation marks and citations omitted). Rather, courts should seek a "ballpark average among those involved in the relevant conduct." Id.

At step four, when comparing the defendant's role in the criminal activity to the average participant's role, courts have a two-part inquiry. A defendant must first demonstrate, as a threshold matter, they are "substantially less culpable than the average participant in the criminal activity." Mendoza- Maisonet, 962 F.3d at 23 (quoting U.S.S.G. § 3B1.2 cmt. n.3(A)). "If that requirement is met, then a district court must evaluate the defendant's classification among the pool of defendants eligible for an adjustment." Walker, 89 F.4th at 185 (internal quotation and citation omitted). Defendants must either demonstrate they are "**less culpable than most** other participants in the criminal activity" for a minor participant reduction or "plainly **among the least culpable** of those involved" for a minimal participant adjustment. Guía-Sendeme, 134 F.4th at 617 (quoting U.S.S.G. § 3B1.2 cmt. n.4 and 5) (emphasis in original). "[T]he fact that someone else might have been more culpable than [the] defendant] does not necessarily mean that [the defendant's] participation was minor [or minimal]." De la Cruz-Gutiérrez, 881 F.3d 221, 226 (1st Cir. 2018).

When measuring the defendant's culpability against that of the average participant, the Commentary Notes state that a court should consider the following non-exhaustive list of factors when assessing a defendant's role:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii)     the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii)     the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv)     the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> (v)     the degree to which the defendant stood to benefit from criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C).

The purpose of the five factors is not to establish guilt, but "to help a court decide whether to apply leniency because a defendant, while guilty, played a substantially subordinate role in the criminal activity." Guía-Sendeme, 134 F.4th at 624; Flores-Álvarez, 2025 WL 1369300 at *3 ("The purpose of these five factors is to ultimately measure a defendant's culpability against that of the average participant who took part in the criminal activity."). "An evaluation of these factors does not require extensive analysis, but it does require both a judgment about the defendant's own conduct and a comparison to the other participants." Walker, 89 F.4th at 187 (internal citations omitted).

### B. Application of U.S.S.G. § 3B.1.2 to U.S.S.G. § 2D1.1 Cases

Under the November 1, 2025 amendments to the Sentencing Guidelines, the Guía-Sendeme gauntlet is but the beginning in drug

trafficking cases. Now, even if the Defendant **cannot** establish that he is "substantially less culpable than the average participant" under an ordinary application of § 3B.1.2 and Guía-Sendeme, a mitigating role adjustment may be available in cases covered by U.S.S.G. § 2D.1. *See* U.S. Sent'g Comm'n, Guidelines Manual § 2D.1 (Nov. 2025). This means that a sentencing court must now evaluate defendant's role under both 3B1.2 (and Guía Sendeme) and under the special instructions to U.S.S.G. § 2D.1.

The special instructions in § 2D.1(e)(2)(B) provide that a mitigating role adjustment is generally warranted for "low-level" and "lowest level" drug trafficking functions "**regardless of whether the offense involved other participants in addition to the defendant, and regardless of whether the defendant was substantially less culpable than the average participant in the criminal activity**" is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

The special instructions provide that a 4-point minimal participant deduction under U.S.S.G. 3B1.2(a) "is generally warranted if the defendant's primary function in the offense was plainly among the lowest level of drug trafficking functions, such as serving as a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout." U.S.S.G. § 2D.1(e)(2)(B)(i). The special instructions alternatively provide

Criminal No. 22-380-1 (RAM)                                          18

that a 2-point minor participant deduction under §3B1.2(b) "if the defendant's primary function in the offense was performing another low-level trafficking function, such as distributing controlled substances in user-level quantities for little or no monetary compensation or with a primary motivation other than profit (e.g., the defendant was otherwise unlikely to commit such an offense and was motivated by an intimate or familial relationship, or by threats or fear to commit the offense)." U.S.S.G. § 2D1.1(e)(2)(B)(ii).

If the Defendant qualifies for a mitigating role adjustment, then additional downward adjustments flow from U.S.S.G. § 2D.1(a)(5) "regardless of whether the defendant receives the required [mitigating role] adjustment from by direct application of §3B1.2 **or** by use of the special instruction in s*ubsection (e)(2)(B).*" *See* U.S.S.G. § 2D1.1 (E)(2)(C)(emphasis added).

### III. ANALYSIS

**A. Acosta did not perform a low-level drug trafficking function and does not qualify for a mitigating role adjustment under the special instructions for application of U.S.S.G. § 3B1.2 to U.S.S.G. § 2D1.1 cases.**

The Probation Officer's, the Government's, and Acosta's analysis of whether Defendant qualifies for a mitigating role revolved around the special instructions in § 2D.1(e)(2)(B). Thus, the key question is whether Acosta's primary function of loading and transporting hundreds of kilograms of cocaine falls within the

Criminal No. 22-380-1 (RAM)                                            19

definition of "courier" in U.S.S.G. § 2D.1.(e)(2)(B)(i) as the Probation Officer concluded and his attorney advocates.  The Court is of the view that the answer is "no", based on the other examples of "lowest level of drug trafficking functions" that follow the inclusion of "courier" in U.S.S.G. § 2D.1.(e)(2)(B)(i) such as: "running errands, sending or receiving phone calls or messages, or acting as lookout."

According to the First Circuit, "the canon of noscitur a sociis teaches that statutory words are often known by the company they keep. Under this canon, a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." City of Providence v. Barr, 954 F.3d 23, 34 (1st Cir. 2020); see also Fischer v. United States, 603 U.S. 480, 481 (2024). Thus, the other examples of "lowest level drug-trafficking function[s]" in U.S.S.G. § 2D1.1(e)(2)(B)(i) serve to define and limit the reach of the term "courier". The common denominator between fielding phone calls, and running errands, or acting as lookout is the relatively menial and peripheral nature of the task. See Kyle F. Ziemnick, The Association Game: Applying Noscitur A Sociis and Ejusdem Generis, 111 Va. L. Rev. 1067, 1078 (2025) (explaining that when using noscitur to a list of words, phrases, or clauses, courts consider the "common trait" or "least common denominator" amongst them). Consequently, the "courier" that may qualify for § 2D.1.(e)(2)(B)(i)'s aegis must be engaged in a

Criminal No. 22-380-1 (RAM)                                              20

similarly menial and peripheral task. *See* United States v. Rivas

Contreras, No. 25-CR-4185-TWR, 2026 WL 412482, at *1 (S.D. Cal.

Feb. 13, 2026) (applying noscitur a sociis to § 2D1.1(e)(2)(B)(i)

and holding that for said special instruction to apply the

"courier" role performed by the defendant must be functionally

equivalent to the other tasks listed).

Considering the totality of the circumstances and narrowing

it to its essence, Acosta's primary function was loading and

transporting hundreds of kilograms of cocaine. The Court will not

blithely minimize and equate it to "running an errand", fielding

phone calls, or merely acting as "lookout." U.S.S.G. §

2D1.1(e)(2)(B)(i). *See e.g.* Rivas Contreras, 2026 WL 412482, at *3

(finding that a defendant transporting a large quantity of drugs

across the international border "performs a significant drug

trafficking function that is integral to the overall success of

the drug trafficking organization and is in no way akin to running

an errand, sending or receiving a message, or acting as a

lookout").

Likewise, Acosta's primary function cannot be minimized and

equated to the examples of "another low-level drug trafficking

function" like "distributing controlled substances in user level

quantities for little or no monetary compensation or with a primary

motivation other than profit" to qualify for a 2-point deduction

under the special instruction in U.S.S.G. 2D1.1(e)(2)(B)(ii). *See*

Criminal No. 22-380-1 (RAM)                                          21

Rivas Contreras, 2026 WL 412482, at *3 (holding that U.S.S.G. § 2D1.1(e)(2)(B)(i) must be read in harmony with U.S.S.G. § 2D1.1(e)(2)(B)(ii) and thus a defendant under the former special instruction must be less involved than a defendant under the latter). To state the obvious, 558 kilograms of cocaine are not a "user level quantity."

The Court's conclusion that Acosta does not qualify for mitigating role under the special instructions to U.S.S.G. § 2D1.1 is bolstered by First Circuit case law under U.S.S.G. § 3B1.2 which considers the quantity and value of drugs transported as factors in assessing the defendant's role. *See e.g.* United States v. De la Cruz-Gutierrez, 881 F.3d 221, 227 (1st Cir. 2019)(upholding district court's inference that defendant was a person of trust within the drug trafficking organization due to his participation as a crew member aboard a small vessel smuggling millions of dollars in cocaine); United States v. Vargas, 560 F.3d 45, 51 (1st Cir. 2009)("[T]he large quantity of drugs hauled by the defendant was a relevant datum in assessing role in conspiracy.").

**B. Acosta is not less culpable than the average participant under analysis mandated by Guía-Sendeme and thus does not qualify for a mitigating role adjustment under the standard U.S.S.G. § 3B1.2 analysis.**

While the parties and probation officer refrained from the Guía-Sendeme analysis, the Court undertakes it to determine whether Acosta qualifies for a mitigating role adjustment under

Criminal No. 22-380-1 (RAM)                                                  22

the standard U.S.S.G. § 3B1.2 analysis.

First, the scope of the conduct for which Defendant is being held accountable is the drug smuggling venture that occurred on August 18-19, 2022. *See* Guía-Sendeme, 134 F.4th at 622. This includes activities undertaken in preparation for that offense, to "compare the defendant against all likely participants involved with the shipment." Id. at 620.

Next, based on the Amended PSR and the proffers by counsel, the Court can identify the following participants in this drug-smuggling event: (a) the supplier of the cocaine; (b) the boat crew; (c) a recruiter known as EL GRANDE; (d) Acosta himself; (e) co-defendant Jimenez; (f) the third occupant of the Silverado who was not apprehended; and (g) the receiver or "big shot" who would take possession of the cocaine.

Second, based on the limited facts provided, the Court views the continuum of culpability as follows: (a) the supplier of the cocaine; (b) the receiver or "big shot" who would take possession of the cocaine; (c) a recruiter known as EL GRANDE; (d) the boat crew; (e) Acosta himself, codefendant Jimenez, and the third occupant of the Silverado who was not apprehended.[3]

---

[3] As noted earlier, the Court requested and reviewed the ROIs which are essentially worthless. They record divergent accounts and shed no light on the details of the role of the boat crew.

Third, based on the established continuum, the Court identifies the boat crew as the average participants.

Fourth, the Court compares Acosta's role to the average participant's role. A defendant must demonstrate as a threshold matter that they are "substantially less culpable than the average participant in the criminal activity." Mendoza-Maisonet, 962 F.3d at 23 (quoting U.S.S.G. § 3B1.2 cmt. n.3(A)).

Turning to the non-exhaustive list of factors in U.S.S.G. § 3B1.2 cmt. n.3(C) to measure Acosta's culpability against the average participant, it stands to reason that both the boat crew members and the Silverado's occupants, including Acosta, understood that the scope of the criminal activity they undertook was transportation of a bulk shipment of cocaine for compensation. Moreover, both the boat crew and Acosta exercised some discretion to exercise their functions as they were entrusted with the same large quantity of highly valuable, illegal cargo. But there is no evidence to compare the remaining factors such as participation in planning the criminal activity, their degree of decision-making authority or the influence in the exercise of such authority, or the degree to which they stood to benefit.  Thus, those factors cannot be used to differentiate between Acosta and the average participants, much less conclude that he is substantially less culpable. Moreover, while the supplier, the receiver or "big shot", and the recruiter or EL GRANDE are more culpable than Acosta, that

Criminal No. 22-380-1 (RAM)                                          24

"does not necessarily mean that [the defendant'] participation was minor [or minimal]." De la Cruz-Gutiérrez, 881 F.3d at 226.

All told, Acosta is not less culpable than the average participant under analysis mandated by Guía-Sendeme and thus does not qualify for a mitigating role adjustment under the standard 3B1.2 analysis.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Objections to the Amended PSR (Docket No. 148) that are stated in the *Government's Sentencing Memorandum* at Docket No. 157. Defendant's Total offense level is thus **37** as per the original PSR. (Docket No. 144).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of July 2026.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE